

1  Cory S. Fein (State Bar No. 250758)
   cory@coryfeinlaw.com
2  Cory Fein Law Firm
   712 Main St., Suite 800
3  Houston TX 77002
   Telephone: (281) 254-7717
   Facsimile: (530) 748-0601
4
   Attorneys for Relator
5

**FILED**

DEC 1 4 2022

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*SEALED BY ORDER OF THE COURT*

6          **UNITED STATES DISTRICT COURT**
           **NORTHERN DISTRICT OF CALIFORNIA**
7                **OAKLAND DIVISION**

   United States of America, and      CASE NO. C22-08864  DMR
8  State of California, *ex rel.* [FILED
   UNDER SEAL],
9                                     **COMPLAINT AND DEMAND FOR**
              Relator,                **JURY TRIAL**
10
       vs.                           **FILED UNDER SEAL PURSUANT**
11                                    **TO 31 U.S.C. §3730(B)(2)**
   [FILED UNDER SEAL],
12
              Defendants.
13

14

15

16

17

18

19

20

21

i

1

2    Cory S. Fein (State Bar No. 250758)
     cory@coryfeinlaw.com
     Cory Fein Law Firm
3    712 Main St., Suite 800
     Houston TX 77002
     Telephone: (281) 254-7717
4    Facsimile: (530) 748-0601

5    Attorneys for Relator

6                 **UNITED STATES DISTRICT COURT**
                **NORTHERN DISTRICT OF CALIFORNIA**
7                       **OAKLAND DIVISION**

8    United States Of America, and State of    | CASE NO. _____
     California, *ex rel.* John Doe,
9                                              | **COMPLAINT AND DEMAND FOR**
                  Relator,                     | **JURY TRIAL**
10
                  vs.                          | **FILED UNDER SEAL PURSUANT**
11                                             | **TO 31 U.S.C. §3730(B)(2)**
     (1) Greenbrook TMS, Inc.
12   (2) TMS NeuroHealth Centers, Inc.
     (3) LifeStance Health Group, Inc.
13   (4) UnitedHealth Group, Inc.; and
     (5) Neuronetics, Inc.
14
                  Defendants.
15

16

17

18

19

20

21

                              ii

I.  PARTIES ............................................................................................... 1

II.  JURISDICTION AND VENUE ............................................................ 2

III.  BACKGROUND FACTS ...................................................................... 3

   A.  Transcranial Magnetic Stimulation (TMS) ........................................ 3

   B.  Medicare Reimbursement for TMS Treatment ................................... 5

   C.  Billing for Unsupervised TMS therapy ............................................. 6

   D.  Billing for TMS Therapy for Ineligible Patients ............................... 7

IV.  DEFENDANTS ................................................................................... 10

   A.  Greenbrook TMS, Inc. ...................................................................... 10

      1.  Growth of Greenbrook TMS, Inc.'s Network of TMS Centers ................. 10

      2.  Greenbrook's Billing for Unsupervised TMS Therapy Sessions .............. 11

      3.  Dr. Kimberly Cress ......................................................................... 13

      4.  Dr. Geoffrey Grammer ...................................................................... 14

      5.  Bill Leonard, Greenbrook's CEO ....................................................... 17

      6.  Examples of Greenbrook Psychiatrists' False Billing for TMS Treatment 23

      7.  Greenbrook's Kickbacks to Physicians ............................................... 24

   B.  UnitedHealth Group, Inc. – Refresh Mental Health ......................... 25

      1.  Acquisitions of Refresh Mental Health ............................................... 25

      2.  Refresh's False Billing for TMS Therapy Sessions ............................... 25

   C.  LifeStance Health, PLLC .................................................................. 27

      1.  Growth of LifeStance ....................................................................... 27

      2.  LifeStance False Billing for TMS Therapy Sessions ............................. 28

   D.  Neuronetics, Inc. ............................................................................... 30

   E.  Overview of Federally-Funded Healthcare Programs ....................... 32

      1.  Medicare ........................................................................................ 32

      2.  Other Federally-Funded Healthcare Programs ..................................... 34

      3.  Fraud on Medicare Advantage Programs .............................................. 35

   F.  Anti-Kickback Statute Violations ..................................................... 42

   G.  Stark Law Violations ........................................................................ 45

V.  FRAUD ON PRIVATE INSURANCE COMPANIES IN VIOLATION OF THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT ..................... 46

VI.    HARM TO PATIENTS .......................................................48

VII.   LEGAL FRAMEWORK .................................................50

VIII.  MEDICARE AND MEDICAID REIMBURSEMENT PROTOCOL...........50

IX.    CAUSES OF ACTION ...............................................53

   A.   COUNT ONE - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(A).........................................53

   B.   COUNT TWO - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(B).........................................54

   C.   COUNT THREE - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(G).........................................54

   D.   COUNT FOUR - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(C).........................................56

   E.   COUNT FIVE - CALIFORNIA INSURANCE FRAUDS PREVENTION ACT, Cal. Ins. Code §1871.7 .......................................56

X.     PRAYER FOR RELIEF ...............................................58

1    Relator John Doe, on behalf of the United States of America and the State of

2 California, brings this qui tam action under the Federal False Claims Act, 31 U.S.C.

3 §3729, *et seq.* ("FCA"), and the California Insurance Frauds Prevention Act, Cal. Ins.

4 Code §1871.7, as enumerated below, against Defendants (1) Greenbrook TMS, Inc.;

5 (2) TMS NeuroHealth Centers, Inc.; (3) LifeStance Health Group, Inc.; (4)

6 UnitedHealth Group, Inc.; and (5) Neuronetics, Inc. In support, Relator alleges as

7 follows:

8 **I.    PARTIES**

9    1.    Relator John Doe (referred to herein as "Relator") is a citizen of the

10 United States of America and the State of Texas.

11    2.    Defendant Greenbrook TMS, Inc. is a Canadian company with its

12 United States headquarters located at 8401 Greensboro Drive, Suite 425, Tysons

13 Corner, Virginia, United States, 22102. Its designated agent for service of process in

14 the United States is TMS US, 8401 Greensboro Drive, Suite 425, Tysons Corner,

15 Virginia, 22102.

16    3.    Defendant TMS NeuroHealth Centers, Inc., is a wholly-owned U.S.

17 subsidiary of Greenbrook TMS, Inc., located at 8401 Greensboro Drive, Suite 425,

18 Tysons Corner, Virginia, United States, 22102. Its designated agent for service of

19 process in the United States is TMS US, 8401 Greensboro Drive, Suite 425, Tysons

20 Corner, Virginia, 22102.

21    4.    Defendant LifeStance Health Group, Inc. is a Delaware corporation

headquartered in Arizona at 4800 N. Scottsdale Rd., Suite 6000, Scottsdale, Arizona 85251. It can be served through its registered agent for service, Corporation Service Co., 251 Little Falls Dr., Wilmington, DE 19808.

5.     Defendant UnitedHealth Group, Inc. ("UnitedHealth"), is a Delaware corporation with principal place of business at 9900 Bren Road East, Minnetonka, MN 55343. It can be served through its registered agent for service, C T Corporation System, Inc., 1010 Dale St. N., St. Paul, MN 55117-5603.

6.     Defendant Neuronetics, Inc. ("Neuronetics") is a Delaware corporation with its principal place of business at 3222 Phoenixville Pike, Malvern, Pennsylvania 19355. It can be served through its President, Rajiv Sawhney at Neuronetics' registered office, 3222 Phoenixville Pike, Malvern, PA 19355.

## II.     JURISDICTION AND VENUE

7.     Jurisdiction in this Court is proper pursuant to 31 U.S.C. §§3732(a) and 3730(b). This Court can also exercise jurisdiction pursuant to 28 U.S.C. §§1331 and 1367, including over any state law claims asserted herein.

8.     This Court can exercise personal jurisdiction over the Defendants and venue is proper in this District, pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391, because the acts proscribed by 31 U.S.C. §3729, *et seq.*, and California law complained of herein took place in whole or in part in this District and the Defendants regularly transacted business in this District.

9.     Venue is appropriate pursuant to 28 U.S.C. §1391 and 31 U.S.C.

2

1   §3732(a) because Defendants may be found in this District, transact business in this

2   District, and many of the acts proscribed by 31 U.S.C. §3729 occurred within this

3   District. Venue is appropriate for any state law claims for the same reasons.

4       10.    Relator is an original source of the information upon which this

5   Complaint is based as that phrase is used within the FCA and CIFPA.

6       11.    None of the allegations set forth in this Complaint are based upon a

7   public disclosure of allegations or transactions in: (a) a federal criminal, civil or

8   administrative hearing to which the United States government is a party; (b) a

9   congressional, administrative or General Accounting Office report, hearing, audit or

10  investigation; or (c) the news media, as those terms are used in 31 U.S.C.

11  §3730(e)(4)(A).

12      12.    Prior to filing this lawsuit and prior to any public disclosures regarding

13  this matter, Relator voluntarily provided the information set forth herein to agents of

14  the United States Department of Justice in accordance with 31 U.S.C. §§3730(b)(2)

15  and 3730(e)(4)(B) and to the California Department of Insurance.

16  **III.    BACKGROUND FACTS**

17      **A.    Transcranial Magnetic Stimulation (TMS)**

18      13.    Transcranial magnetic stimulation ("TMS") is a noninvasive procedure

19  that uses magnetic fields to stimulate nerve cells in the brain to improve symptoms

20  of depression. TMS is typically used when other depression treatments have not been

21  effective. This treatment for depression involves delivering repetitive magnetic

3



1  pulses, so it is often called repetitive TMS or rTMS.



© MAYO FOUNDATION FOR MEDICAL EDUCATION AND RESEARCH. ALL RIGHTS RESERVED.

13      14.    During an rTMS session, an electromagnetic coil is placed against the

14  patient's scalp near the forehead. The electromagnet painlessly delivers a magnetic

15  pulse that stimulates nerve cells in the brain region involved in mood control and

16  depression. It is thought to activate regions of the brain that have decreased activity

17  in depression.

18      15.    The stimulation appears to impact how the brain is working, which in

19  turn seems to ease depression symptoms and improve mood.

20      16.    The electromagnetic coil placed on the scalp induces focal current in the

21  brain that temporarily modulates cerebral cortical function.

4

17.     Capacitor discharge provides electrical current in alternating on/off pulses. Stimulation parameters may be adjusted to alter the excitability of the targeted structures in specific cortical regions.

18.     TMS is delivered in outpatient settings without anesthesia or analgesia. Typically for the treatment of depression, the coil is located over the left prefrontal cortex. The rTMS is performed daily (weekdays) for 6 weeks.

**B.      Medicare Reimbursement for TMS Treatment**

19.     CMS reimburses TMS treatment under the following CPT codes:

90867: Therapeutic repetitive transcranial magnetic stimulation (TMS) treatment; initial, including cortical mapping, motor threshold determination, delivery and management

90868: therapeutic repetitive transcranial magnetic stimulation (TMS) treatment; subsequent delivery and management, per session

90869: therapeutic repetitive transcranial magnetic stimulation (TMS) treatment; subsequent motor threshold re-determination with delivery and management

20.     ICD-10-CM codes that support medical necessity for TMS treatment include F32.2 (Major depressive disorder, single episode, severe without psychotic features), and F33.2 (Major depressive disorder, recurrent severe without psychotic features).

21.     CMS considers TMS therapy reasonable and necessary when it is furnished in accordance with the accepted standards of medical practice, when it is furnished in a setting appropriate to the patient's medical needs and condition, when

it meets but does not exceed the patient's medical need and when it is ordered and furnished by qualified personnel.

### C.   Billing for Unsupervised TMS therapy

22.   TMS therapy must be ordered by, and furnished under, the direct supervision of a psychiatrist who has experience administering TMS therapy.

23.   "TMS therapy not ordered by and *furnished under direct supervision, by a psychiatrist* will be considered not medically reasonable and necessary and not subject to coverage." LCD L36469 (issued 2/8/2016 by CGS). "The physician must have experience in administering rTMS therapy and the treatment must be given under *direct supervision of this physician, i.e., he or she must be in the area and be immediately available.*" LCD L33398 (issued 10/1/2015 by Novitas). "It is expected that TMS therapy will be ordered by a psychiatrist and furnished *under the direct supervision of a qualified physician* (MD or DO) who has experience administering TMS therapy." LCD L37088 (issued 03/22/2018 by Noridian.) "The medical record documentation must support that the attending physician has met with the patient *face to face for the initial assessment and for subsequent delivery and management,* when there is a change in the individual's mental status and /or other significant change in clinical status." A57647 (issued 10/03/2018 by First Coast Service Options, Inc.)

24.   Defendants (1) Greenbrook TMS, Inc.; (2) TMS NeuroHealth Centers, Inc.; (3) LifeStance Health Group, Inc.; and (4) UnitedHealth Group, Inc.

6

(collectively, the "Billing Defendants") knowingly billed Medicare, other government payors and private insurers for numerous TMS therapy sessions that were administered without physician supervision.

25. These Billing Defendants made false statements to these payors that these treatments were properly supervised in order to receive payments.

26. Through use of fabricated medical records and documents, they misdiagnosed the patients and fraudulently documented their charts to make the patients appear to satisfy the TMS criteria.

27. They documented patient files with false progress notes that were prepared by technicians without physician supervision, and falsely stated that physicians provided direct supervision.

28. Defendant Neuronetics, Inc. ("Neuronetics") as further described below, did not bill for TMS treatments, but provided the equipment, including the NeuroStar Advanced Therapy System ("NeuroStar System"), used by the Billing Defendants to administer the TMS treatments. As described below, Neuronetics did not just provide the equipment; it actively conspired with the Billing Defendants to create the schemes used to falsely bill for unsupervised TMS treatments provided to patients who did not meet the criteria, and to fabricate patient charts to make them appear to be eligible.

**D.    Billing for TMS Therapy for Ineligible Patients**

29. In addition to improperly billing for administering TMS treatments that

were not supervised by physicians, Billing Defendants also administered TMS treatments to patients who were not eligible to receive TMS treatments.

30.     Lack of eligibility falls into a few categories: (1) patients who were not severely depressed; (2) patients who were suicidal; (3) patients who had not yet unsuccessfully attempted to treat their conditions by other means including failed medication trials and failed therapy; (4) patients who suffered from other mental conditions precluding TMS; and (5) patient who suffered from non-mental medical condition precluding TMS.

31.     As stated above, Medicare regulations and the rules of other government payors and private insurers only permit reimbursement for TMS treatment for patients who meet all criteria for eligibility.

32.     Billing Defendants and Neuronetics trained intake staff to falsify patient charts in order to make them falsely appear to meet the criteria for TMS treatment. The Defendants propagated the fraudulent practices through centralized corporate policies and procedures.

33.     As further described below, Billing Defendants knowingly billed Medicare, other government healthcare programs, and private insurers for providing TMS treatment to patients who were not eligible for treatment, and falsified patient records to make the patients appear to be eligible. Neuronetics conspired with Billing Defendants to create the false filling scheme.

34.     The false billing scheme included providing false information to obtain

8

1    prior authorization for TMS therapy as well as to justify continuation of the TMS
2    therapy.

3        35.    TMS therapy is only justified if the doctor evaluates the patient on a
4    weekly basis and documents the improvement or seriousness of the depression.
5    Medicare guidelines provide that TMS treatment is only deemed necessary if a doctor
6    evaluates the patient on a weekly basis and notes improvement by the rating scales
7    administered by the doctor.

8        36.    Defendants billed for TMS treatments without meeting these criteria and
9    they fabricated records to make it appear that these criteria were met. In fact,
10   Defendants' patients were not seen by a doctor on a weekly basis at all.

11       37.    This was not a minor, inadvertent, occasional, or inconsequential
12   oversight. Defendants' business models were premised on this pattern of falsely
13   billing for providing unsupervised TMS treatment to patients who did not meet the
14   criteria to receive the treatments. This business model fueled the profits of the Billing
15   Defendants and of Neuronetics.

16       38.    The practice of having a single psychiatrist cover four or five TMS
17   centers that were staffed only by low-salary technicians was extremely profitable.

18       39.    Defendants were able to have their physicians in their offices seeing and
19   billing patients at the same time that 34 of the 36 TMS sessions were being
20   administered (without physician supervision) to other patients, as if the physicians
21   were present supervising the procedures in the TMS centers.

9

40.     The high profit margins caught the attention of the financial community as evidenced by the private equity firms and large healthcare companies scrambling to purchase companies with TMS centers, as further described below.

## IV.   DEFENDANTS

### A.   Greenbrook TMS, Inc.

#### 1.   Growth of Greenbrook TMS, Inc.'s Network of TMS Centers

41.     As of September 30, 2022, Greenbrook TMS, Inc. ("Greenbrook") owned and operated 183 TMS Centers in California, Iowa, New Jersey, Nevada and Wisconsin, Massachusetts, Virginia, Pennsylvania, Maryland, Delaware, North Carolina, Missouri, Illinois, Ohio, Texas, Connecticut, Florida, South Carolina, Michigan, Alaska, and Oregon.

42.     Greenbrook's predecessor (TMS NeuroHealth Centers, Inc.) was established in 2011. Greenbrook grew aggressively through acquisition of other TMS companies. On July 14, 2022, Greenbrook TMS, Inc., through its wholly-owned U.S. subsidiary, TMS NeuroHealth Centers Inc., acquired Check Five LLC, dba Success TMS) ("Success TMS"). By acquiring Success TMS (one of the largest providers of TMS therapy in the United States), Greenbrook added 47 active TMS centers to its platform and expanded Greenbrook into Illinois, New Jersey, Nevada and Pennsylvania.

43.     In September 2019, Greenbrook's U.S. subsidiary acquired Achieve

10

1    TMS West. In October 2021, it acquired Achieve TMS West and Achieve TMS

2    East/Central, adding 17 new TMS centers in New England and the central U.S.

3         44.    Greenbrook's 183 TMS Centers generally operate Monday through

4    Friday during standard business hours, with holiday, weekend and extended hours by

5    appointment. The treatment is intensive. Patients receive TMS therapy five days per

6    week for six to nine weeks, with each TMS session lasting 18 – 45 minutes.

7              **2.    Greenbrook's Billing for Unsupervised TMS Therapy
                        Sessions**

8         45.    Although Medicare regulations (and the rules of other government

9    payors and private insurers) are clear that TMS therapy sessions must be supervised

10   by a licensed physician, Greenbrook's psychiatrists routinely bill for sessions that are

11   not physician-supervised. In fact, the very essence of Greenbrook's business model

12   is to operate in blatant violation of this requirement.

13        46.    Greenbrook employs fewer than 30 psychiatrists who bill for

14   supervising TMS sessions. It is impossible for this small number of psychiatrists to

15   supervise TMS sessions that are being performed all day, every work day, at

16   Greenbrook's 183 TMS Centers.

17        47.    In fact, the TMS sessions performed at Greenbrook's TMS Centers are

18   operated and supervised by non-physician technicians. Greenbrook's physicians'

19   involvement is limited to writing notes at the end of the six-nine week series of

20   treatments.

21

11

48. Greenbrook falsely bills for these TMS treatments as being supervised by physicians despite knowing that they are only supervised by technicians. Greenbrook knows that applicable rules and regulations require physician supervision and falsely represents that these treatments are physician-supervised in order to receive payment.

49. Greenbrook and the other Billing Defendants billed for TMS sessions, that were not administered on the correct days and falsely documented patient files to make them appear that the sessions were administered on a timely basis.

50. As per Medicare guidelines, if TMS sessions are not given on an almost daily basis within a 6-7 week period, the TMS treatments fail to satisfy the medical necessity requirement. Often patients found it inconvenient to receive the TMS treatments that frequently. In these situations, Greenbrook and the other Billing Defendants would allow the patients to receive the TMS treatments at whatever schedule they chose, but falsely document the patients' charts to make it appear that they were getting the treatments on a daily basis as required.

51. Greenbrook reported 54,525 TMS treatments during the second quarter of 2022, and 95,046 treatments performed during the third quarter of 2022. Greenbrook does not have near enough licensed physicians to have supervised that huge volume of TMS treatments.

52. Greenbrook's business model of falsely billing for TMS treatments has been confirmed by Kimberly Cress (Greenbrook's Texas Regional Medical

12

Director), Dr. Geoffrey Grammer (Greenbrook's Chief Medical Officer) and Bill Leonard (Greenbrook's CEO), as described below.

### 3.   Dr. Kimberly Cress

53.    Dr. Kimberly Cress joined Greenbrook in November 2018 as Regional Medical Director of Greenbrook's Texas region. She has been involved in Greenbook's TMS treatment operations and expanding Greenbrook's business.

54.    Cress admitted that Greenbrook's expansion relied on Greenbrook providing TMS treatments that were not supervised by a physician.

55.    She admitted that she covered multiple Greenbrook locations and that TMS treatments in these locations were not supervised by physicians. She tasked unsupervised technicians with administering the TMS treatments, handling the follow-ups, and documenting the treatments. Her involvement was limited to evaluating the first TMS session.

56.    Cress confirmed that this was not just the operation in Texas, but rather was the operation at all Greenbrook TMS facilities. Cress admitted that Greenbrook technicians run the TMS sessions every day without physician supervision, which permits Greenbrook's physicians to spend their time in their office seeing patients. She bragged that this permitted her to simultaneously earn revenue from the unsupervised TMS sessions (billed under her NPI, despite her not being present at the TMS session) and earn revenue from treating patients in her office at the same time.

### 4.   Dr. Geoffrey Grammer

57.   Dr. Geoffrey Grammer is Greenbrook's Chief Medical Officer, in charge of developing TMS therapy treatment protocols and overseeing training of staff physicians and technicians.

58.   He explained that Greenbrook's business model is straightforward. Greenbrook ensures that most of its patients get TMS and does not "burden its doctors with paperwork."

59.   Grammer ensured that Greenbrook has a strong clinical team that helps Greenbrook's TMS coordinators get the paperwork right to avoid detection of improper billing.

60.   Grammer explained that, even though Medicare does not require prior authorization before a patient is given TMS treatment, Greenbrook trains its technician to fabricate documents in patient charts to avoid detection of false billing by any audit.

61.   Greenbrook knows that Medicare will only pay for a patient to receive TMS treatment if the patient's condition has first been treated unsuccessfully with medication.

62.   Greenbrook trains its staff to fabricate documents in patient charts to falsely show failed attempts at treating the patient's condition with medication, before resorting to TMS treatments.

63.   Grammer explained that Greenbrook's philosophy regarding dealing

14

with the requirements of Medicare and insurance companies is to "dance to their tunes" and fabricate the patients' charts to falsely reflect what is necessary to justify the TMS treatments.

64.     Grammer explained that patients do not care about these fabrications, as long as they get the TMS sessions, and the patients do not even see the fabricated documents in their charts.

65.     Grammer explained that Greenbrook's practice is for a doctors to supervise a patient's first session only for the patient's TMS "motor threshold."

66.     The motor threshold is the minimum TMS intensity sufficient to produce a predefined motor-evoked potential (MEP) in the contralateral abductor pollicis brevis in at least 50% of trials. In other words, it is roughly a measure of the TMS intensity necessary to evoke a peripheral motor response. Because the TMS motor threshold is highly variable across individuals, it must be determined at the beginning of each patient's series of TMS treatments. Determining the TMS motor threshold is done to calibrate and normalize TMS coil output energy for each patient based on the patient's individual physiologic variability and it determines both dose and safety limits.

67.     Greenbrook's business model involves the physician being present only for the first session, for the determination of a patient's motor threshold. For the remaining sessions, the physician is not present and the sessions are performed entirely by technicians with no direct supervision.

68.     Greenbrook bills Medicare and other payors as if the physician directly supervised every TMS session even though the physician only supervises the first session.

69.     Greenbrook may claim that physicians are available to the technicians by telephone if needed, but (1) being available by telephone is not sufficient to constitute physician supervision and (2) the physicians are actually not available, even by telephone.

70.     Grammer explained that Greenbrook regularly has physicians go on vacation while the physicians' patient receive unsupervised TMS treatment by technicians.

71.     Grammer explained that Greenbrook makes this false billing scheme to other psychiatrists via Greenbrook's "on-site plan." Under this plan, Greenbrook credentials a psychiatrist under Greenbrook's name and places a TMS machine in that psychiatrist's office along with a Greenbrook's technician. Grammer's "on-site plan" sales pitch to psychiatrists is that psychiatrists can get paid for simply referring patients to Greenbrook for TMS treatment, Greenbrook's technician will do everything, and the psychiatrist will not have any expenses. Grammer explained that this is :a pretty neat arrangement for busy doctors as there is additional revenue stream without any increased risk."

72.     Grammer explained that Greenbrook also has doctors who are busy and have Greenbrook's TMS center in the doctor's clinic but also choose to be designated

16

1    as the "medical director" of a nearby Greenbrook standalone clinics.

2    73.    Grammer explained that, under this arrangement, the physician does not

3 have to be at Greenbrook's TMS center site for follow-up sessions and can

4 simultaneously earn revenue treating patients in their offices, while Greenbrook's

5 unsupervised technicians provide TMS treatment sessions and bill for it using that

6 doctor's NPI.

7    74.    Grammer clarified that none of Greenbrook's doctors ever stay for

8 follow-up sessions because they are practicing in their own world and seeing patients

9 at their offices.

10    75.    Grammer explained that Greenbrook must be flexible to accommodate

11 patient schedules because the TMS treatments are generally given to each patient on

12 a daily basis, five days per week.

13            **5.**    **Bill Leonard, Greenbrook's CEO**

14    76.    Bill Leonard, Greenbrook's CEO, explained Greenbrook's business

15 model as follows. Greenbrook has a very profitable company with TMS treatment

16 centers all over the country. It is building new centers at a rate that makes it the largest

17 expanding company in behavioral health, with an aggressive marketing team.

18    77.    Greenbrook entices psychiatrists to join its false billing scheme by

19 offering them to be named as the Medical Director of a Greenbrook TMS facility.

20    78.    Greenbrook also offers to lease a small room at a psychiatrist's office,

21 credential the psychiatrist under Greenbrook for billing purposes, and operate the

1  room in the psychiatrist's office as if it was a stand-alone office. The psychiatrist

2  would simply refer the patients and let Greenbrook take over.

3     79.   Bill Leonard promises that psychiatrists can enjoy an additional revenue

4  stream of as much as $250,000 per year for doing nothing more than referring patients

5  to receive TMS treatments. He promises that Greenbrook has ways to pay

6  psychiatrists even if they are not under Greenbrook's payroll, but that Greenbrook

7  can get much more reimbursement than psychiatrists can get on their own.

8     80.   For psychiatrists who do not have the space to set up a TMS machine,

9  Bill Leonard explained that Greenbrook will make them a Medical Director at a

10  facility if they will agree to refer and encourage their patients to get TMS treatments

11  there.

12     81.   Bill Leonard echoed Grammer's statement that psychiatrists need only

13  be present for a patient's first TMS session, so a psychiatrist need only come to the

14  TMS center 2-4 times per month for 1-2 hours and then the center will take over.

15     82.   Leonard explained that if the patient is in the psychiatrist's practice, the

16  patient would continue seeing the psychiatrist at his office, but if the patient is

17  Greenbrook's independent client, the psychiatrist need never see the patient again.

18     83.   Leonard explained that Greenbrook makes independent contractor

19  agreements with every physician and represents that Greenbrook's legal department

20  has thoroughly vetted this arrangement and that everything is legitimate.

21     84.   Leonard promised that the psychiatrist can get money for each session

18

1   and make anywhere from $2200 to $3000 per patient without any effort.

2       85.    Leonard explained the process as follows. When a patient contacts TMS

3   (either as a referral from the psychiatrist or by calling the hotline), Greenbrook

4   screens them to ensure that they are insured by Medicare or other insurance that

5   covers TMS services. Once Medicare or other insurance is verified, Greenbrook

6   schedules an appointment for the patient with a Greenbrook intake worker.

7       86.    Greenbrook's intake worker explains to the patient what the patient must

8   say in order to qualify for TMS treatment. Greenbrook trains its intake staff to coach

9   new patients into giving the history necessary to qualify for TMS treatment,

10  regardless of whether the history is true.

11      87.    Greenbrook's intake worker documents the patient's charts with facts

12  (true or not) to satisfy Medicare or other insurance requirements. Greenbrook trains

13  its staff to "look for trigger points where TMS treatment could be denied" and avoid

14  those.

15      88.    Leonard explained that Greenbrook trains its staff to "fill up each

16  patient's chart with all the failed medications and therapy trial failures." He admitted

17  that it is rare that Greenbrook's intake worker does not have to "manipulate the form

18  a bit" to make the patient meet the criteria for TMS treatment. Greenbrook trains its

19  intake workers to fill in the depression rating scales for the patients in order to ensure

20  that all criteria are met, justifying this fraud as helping the patient avoid being

21  burdened with all the Medicare or insurance requirements.

19

89.   Leonard explained that once a patient is started on TMS treatment, the patient rarely complains about any issues like filling out rating scales. Greenbrook takes efforts to ensure the patient does not contradict the false information on the patient's chart completed by Greenbrook's intake staff.

90.   Greenbrook's intake staff is trained that if a patient is in a psychiatric hospital, has attempted suicide, or is experiencing paranoia, that this information is kept out of the patient's chart and never mentioned in a patient's progress notes.

91.   Leonard explained that Greenbrook's doctors are "pretty savvy in knowing what to document" so that TMS treatment always appears to be justified.

92.   Leonard explained that Greenbrook rarely denies TMS treatment to a patient once Greenbrook confirms that the patient is covered by Medicare or insurance that covers TMS treatment. Leonard's philosophy is that he considers it "bad business to deny TMS treatment to patients who want it," and that "patients should not be denied the TMS treatment they want, and psychiatrists should not be denied the revenue from the TMS treatments." "If there are insurance limitations, we fix it."

93.   Leonard explained that they have to do some trickery for private insurance and Medicare Advantage plans but falsely billing Medicare is easy, because Medicare does not require pre-approval and does not audit Greenbrook's TMS treatments.

94.   Next, Greenbrook sets up an appointment with the psychiatrist in the

1   psychiatrist's office or at the TMS center for the purpose of the psychiatrist signing

2   progress notes, which falsely represent that the psychiatrist supervised the TMS

3   sessions.

4       95.   Leonard assures psychiatrists that they do not need to come to the

5   Greenbrook TMS center other than to start the new patient's first session. "In fact,

6   you won't even set eyes on the patient after the first session, until it is absolutely

7   necessary and I can assure you, we rarely trouble our doctors."

8       96.   Leonard explained, "On the day of the first TMS appointment, the

9   technician sets up everything and the psychiatrist just goes to the machine and starts

10   the first session." Electronic protocols are already se for all the patients, so the

11   psychiatrist does not need to vary the motor threshold very much. Greenbrook's

12   technicians are trained to set the motor threshold to 40% or so.

13       97.   Greenbrook certifies its technicians and psychiatrists in TMS service.

14       98.   Greenbrook lays everything out for the psychiatrist, even the progress

15   notes. Leonard explains that the psychiatrist introduces himself to the patient, even

16   though the patient may not know or remember the psychiatrist.

17       99.   Leonard explained that Greenbrook only requires that the psychiatrist

18   be present for the first session, but even that is just a formality because Greenbrook's

19   technicians know how to set up the protocol and start the service; under Greenbrook's

20   procedure, there is hardly any variation of the service by any doctor.

21       100.   Greenbrook provides basically the same treatment to each patient, with

1    any minor deviations generally decided by the technician rather than the psychiatrist.

2           101.   Leonard explained that he is not troubled by the unsupervised treatments

3    being given because he considers TMS treatment to be totally harmless, even safer

4    than cell phones. He explained that the patient feels much better just because the

5    patient is getting some treatment such that "even the placebo effects are huge."

6           102.   He explained:

7           The technician documents the treatment and you collect money. We even hire
            a TMS technician for you. We train them well about all the operations. It is
8           totally worry-free for the doctor. You do what you do, without changing
            anything. We also train you how to do the first session and we have a system
9           for giving you template treatment plans. Our central team monitors everything
            and helps out in every step. Our technician will work with our marketing and
10          reimbursement team. Our software will guide the TMS delivery throughout
            and the technician and our staff will manage everything. Once the patient
11          comes to our technician and you start the first session, you don't need to do
            anything further until the end.

12
            Our technician makes progress notes, engages the patient, gives all the
13          sessions, calls the billing team, enters all the CPT codes and date of service.
            All you need to do is to make sure that you approve the progress notes before
14          billing on your computer. All our physicians are so happy because they have a
            constant revenue stream. We have physicians who want to be Medical Director
15          of multiple clinics and if you have room in your schedule, we would love that.
            Obviously, you get a stipend for each clinic as Medical Director and also
16          revenue for each collectible.

17          Once insurance companies approve, they simply pay. Even if patients can't
            come on the approved days, we allow that. After all, they will get all their
18          required sessions. Lot of times they can't afford to pay their copays and we
            work with them in alternate ways, so that they don't have to pay. We help them
19          to waive through financial means, through other financial loans, which are
            going to be never pushed as we have deals with the financial company, or just
20          credit them with sessions (giving lesser sessions). Almost all of our clients
            can't come on the approved days because we have given them daily sessions,
21          as per the insurance approval. But they can't come every day, we need to be

                                              22

very flexible with the insurance needs and patient needs. Everybody wins, because the patient is happy to get sessions and you get your sessions' revenue and the insurance company is happy to comply. As I said, in Medicare cases, it is never ever an issue. See, the doctors may be at different centers, but they need to go once only for the first session and they stay at their own practice all alone. They cover their hospital duties and everything and never have to come to the clinic. Even for the follow ups for TMS, our technician renders the rating scales and get further authorizations from the insurance.

### 6. Examples of Greenbrook Psychiatrists' False Billing for TMS Treatment

103. Greenbrook bills Medicare $400 per session, using HCPCS Code 90868 (Transcranial magnetic stimulation treatment (stimulates nerve cells in brain to improve symptoms of depression), per session).

104. Dr. Rebecca Maxwell (NPI 1083634208) is a psychiatrist who joined Greenbrook in April 2019 as Medical Director of Greenbrook's League City Center in Texas. In 2020, Dr. Maxwell billed Medicare for 303 treatments under CPT Code 90868 at $400 per session, for a total of $121,200.

105. Dr. Ranganathan N. Ram (also known as Ranga N. Ram) (NPI number 1003846163) is a psychiatrist practicing in Wilmington, Delaware. He joined Greenbrook TMS in February 2017 as Medical Director of its Wilmington, Delaware location. In 2020, Dr. Ram billed Medicare for 650 treatments under CPT Code 90868 at $400 per session, for a total of $260,000. In 2019, Dr. Ram billed Medicare for 625 treatments under CPT Code 90868 at $400 per session, for a total of $250,000.

106. Dr. Megan Toufexis (NPI 1023020021) is a psychiatrist and pediatrician

in Tampa, Florida working at her office in Tampa and also at Greenbrook's Clearwater, Florida location. In 2020, Dr. Toufexis billed Medicare for 403 treatments under CPT Code 90868 at $400 per session, for a total of $161,200.

107.  Dr. Manish Sheth (NPI 1225083272) joined Greenbrook in 2020 as Medical Director of California. He engaged in the same type of false billing as the other Greenbrook physicians described above.

## 7.  Greenbrook's Kickbacks to Physicians

108.  As described above, Greenbrook provided kickbacks to physicians in the form of (1) favorable leasing agreements for offices in the physicians' offices; (2) providing technicians to work in physicians' offices at no cost to the physicians; (3) creating sham "Medical Director" positions for the physicians participating in Greenbrook's scheme, and paying them fees to serve as Medical Directors of Greenbrook's TMS centers; and (4) credentialing the physicians as Greenbrook Medical Directors, billing for the TMS services, and giving a cut to the physician who referred the patient.

109.  These kickbacks were intended to, and did in fact, incentivize the physicians to overutilize TMS treatment for their patients.

110.  As described below, this arrangement violated the Anti-Kickback Statute and the Stark Law, and was designed to maximize profits without regard to the needs of patients.

**B.    UnitedHealth Group, Inc. – Refresh Mental Health**

**1.    Acquisitions of Refresh Mental Health**

111.    Refresh was founded in 2017 as a company that provides outpatient mental and behavioral health services.

112.    The private equity firm Kelso & Company ("Kelso") bought Refresh for around $700 million in December 2020.

113.    Optum Health, a segment or division of Defendant UnitedHealth Group, Inc. ("UnitedHealth") purchased Refresh Mental Health ("Refresh") from Kelso in March 2022.

114.    United Health's Optum division, through Refresh, provides outpatient mental and behavioral health services (including TMS treatment) at around 300 locations in 37 states.

**2.    Refresh's False Billing for TMS Therapy Sessions**

115.    Refresh falsely billed Medicare using the same scheme as used by Greenbrook, described above.

116.    Steven Gold, the CEO of Refresh, explained Refresh's purchase of a large TMS practice in San Francisco consisting of five TMS centers that were covered by only one psychiatrist, Dr. Saad Shakir (NPI 1245367374).

117.    Refresh staffed all five of these TMS centers with technicians who provided patients with TMS treatments every day without physician supervision.

118.    The only physician available to supervise was Dr. Shakir, who

1    obviously could not be simultaneously present in all five TMS centers. Refresh

2    knowingly billed under Dr. Shakir's NPI for unsupervised TMS treatments

3    performed by technicians with no physician supervision.

4        119.   While Saad Shakir (residing in San Jose, California) was working as the

5    full-time Chief of TMS at Refresh (from October 2020 through September 2022) he

6    simultaneously worked as the Chief Medical Officer of Silicon Valley TMS of San

7    Francisco, and the Medical Director of Silicon Valley Center for Medical Weight

8    Loss. He retired in September 2022 and now works as a consultant.

9        120.   Dr. Shakir billed Medicare under the CPT Code 90868 (Transcranial

10   magnetic stimulation treatment - stimulates nerve cells in brain to improve symptoms

11   of depression, per session) 876 times in 2017, 763 times in 2018, 981 times in 2019,

12   and 615 times in 2020. The average billing amount was $500 per session, totaling

13   more than $1.6 million for 2017-2020.

14       121.   Dr. Shakir maintained a full-time psychiatry practice and did not spend

15   his time in TMS centers every day supervising multiple TMS sessions per day.

16       122.   For example, in 2019 when Shakir billed Medicare 981 times under CPT

17   Code 90868, he billed Medicare under other codes 953 times. In 2020 when Shakir

18   billed Medicare 615 times under CPT Code 90868, he billed Medicare under other

19   codes 1,086 times. These other codes included psychotherapy sessions, psychiatric

20   diagnostic evaluations, and established patient visits.

21       123.   Refresh knowingly engaged in the false billing scheme and took efforts

to cover it up. Gold advised Dr. Shakir to perform a sham "self-audit" and return some token amount of money to Medicare occasionally in order to prevent CMS (via Medicare Administrative Contractors and Recovery Audit Contractors) from the fraud via a legitimate audit or review.

124.   This false billing scheme allowed Refresh to increase its TMS billing and maximize its profit margin because it could expand its network of TMS centers by hiring low-salary technicians rather than high-salary psychiatrists.

125.   Refresh, through these fraudulent schemes, billed for unsupervised counseling visits at its various centers. The clinical visits were rendered by unlicensed staff without direct supervision, and falsely documented as if performed by licensed staff.

126.   During the Covid pandemic period, Refresh permitted unlicensed staff to practice telemedicine and fraudulent bill for the telemedicine visits as if the licensed clinicians performed the services. The licensed clinicians included licensed social workers, psychiatrists and therapists, who all billed for the inadequate services rendered by unsupervised staff.

## C.   LifeStance Health, PLLC

### 1.   Growth of LifeStance

127.   Lifestance Health Group, Inc. is a Delaware company headquartered in Scottsdale, Arizona. It is one of the largest providers of outpatient mental healthcare in the United States. It is publicly traded on NASDAQ (LSFT). Its 2022 Q3 revenue

1   was $217.6 million and it employs 5,431 clinicians.

2   128.   LifeStance Health Group, Inc. was formed as a Delaware corporation on

3   January 28, 2021 for the purpose of completing an IPO to carry on the business of

4   LifeStance TopCo, L.P. and its consolidated subsidiaries and affiliated practices.

5   129.   LifeStance employs 4,790 licensed mental health clinicians across 32

6   states as of December 31, 2021. In 2021, its clinicians treated over 570,000 unique

7   patients through approximately 4.6 million visits.

8   130.   From March 2017 through December 31, 2021, LifeStance opened 226

9   new centers and completed 77 acquisitions, increasing its total number of centers

10  from 170 at the end of 2019, to 370 at the end of 2020, to 534 at the end of 2021.

11  131.   On May 14, 2020, TPG Inc. acquired a majority of the equity interests

12  of LifeStance Health Holdings, Inc. As of the end of 2021 TPG owned about 64.3%

13  of LifeStance's common stock.

14  132.   LifeStance's payor mix by revenue was 90% commercial in-network

15  payors, 5% government payors, 4% self-pay and 1% non-patient services revenue.

16  **2.   LifeStance False Billing for TMS Therapy Sessions**

17  133.   LifeStance falsely bills Medicare, other government payors and private

18  insurers using the same scheme as used by Greenbrook and Refresh, described above.

19  134.   Anisha Patel-Dunn, D.O is the Chief Medical Officer at LifeStance. She

20  was the co-counder of Pacific Coast Psychiatric Associates, Inc., which was bought

21  by LifeStance.

135.   Danish J. Qureshi is the President and COO of LifeStance. Prior to being COO he was the Chief Growth Officer overseeing all of LifeStance's growth initiatives, including new site openings and expanding into new markets.

136.   LifeStance has one of the largest TMS practices in the nation, and operates under the same business model of having unsupervised technicians administer the TMS treatments, and document the sessions in a manner to ensure payment.

137.   As with the other Defendants, LifeStance's doctors participation in TMS therapy is limited to attending a patient's first session and reviewing technicians' notes from the remainder of the sessions.

138.   LifeStance's executives (including Anisha Patel-Dunn and Danish J. Qureshi) have stated that billing Medicare for TMS treatment is easy because Medicare does not require authorization. LifeStance has boasted that its business model permits physicians to stay in their practice and see their patients as usual for evaluations and medication management, while technicians administer the TMS treatments.

139.   LifeStance bills for TMS treatments in a manner that will get approved, without regard to how and when the TMS treatments are actually administered, or whether the patients receiving the treatments meet the applicable criteria.

140.   LifeStance, through these fraudulent schemes, billed for unsupervised counseling visits at its various centers. The clinical visits were rendered by

1   unlicensed staff without direct supervision, and falsely documented as if performed
2   by licensed staff.

3       141.   During the Covid pandemic period, LifeStance permitted unlicensed
4   staff to practice telemedicine and fraudulent bill for the telemedicine visits as if the
5   licensed clinicians performed the services. The licensed clinicians included licensed
6   social workers, psychiatrists, and therapists, who all billed for the inadequate services
7   rendered by unsupervised staff.

8       **D.    Neuronetics, Inc.**

9       142.   Neuronetics, Inc. ("Neuronetics") manufactures and sells the NeuroStar
10  Advanced Therapy System ("NeuroStar System"). It is the market leader in TMS
11  therapy and obtained the first FDA approval for TMS therapy. As of 2018, it had 781
12  NeuroStar Systems in approximately 615 psychiatrist offices and about 50,000
13  patients treated with about 1.8 million sessions.

14      143.   As of 2021, that number increased to 121,960 global patients treated
15  with over 4.3 million treatment sessions. With sessions often billed at $500 per
16  session, that accounts to more than $2 billion in billing for TMS sessions with the
17  NeuroStar System. Neuronetics' generated revenues of $49.2 million in 2020 and
18  $55.3 million in 2021.

19      144.   Neuronetics is actively involved in its customers' use of TMS therapy.
20  It is involved in training, hiring technicians, documenting notes from treatment
21  sessions, assessment of patients, and billing and conspires to engage in the false

billing practices of the Billing Defendants.

145.   Neuronetics is actively involved with insurance companies and Government payors in making sure its customers using the NeuroStar System get paid.

146.   Neuronetics conspires with the Billing Defendants in order to teach them how to falsely bill for TMS therapy and evade detection by the payors.

147.   Neuronetics educated TMS technicians how to fill out insurance forms and document treatment sessions to ensure payment.

148.   Neuronetics not only sells the equipment, but it also comes to the psychiatrists' offices to set up the TMS operation, including hiring and training technicians, marketing the service, and assisting in getting reimbursement.

149.   One of its payment models is to have the psychiatrist pay Neuronetics per session administered with the NeuroStar System. The equipment records the number of sessions administered.

150.   Neuronetics teaches its customers how to fabricate patient charts to meet the requirements of Medicare, other government payors, and private insurance (including making the records appear that the sessions were all given within a limited time period.)

151.   Neuronetics teaches its customers that Medicare does not restrict the billing to psychiatrists and encourages non-psychiatrist physicians (like surgeons, family practitioners and primary care doctors) to bill for TMS sessions.

152.   Neuronetics gets involved in setting up TMS centers from the ground up for its customers. It also represents that doctors can acquire NeuroStar Systems for their TMS centers and then let Neuronetics handle the entire operation of the center, with the physician only attending the initial session of a new patients, then signing progress notes prepared by technicians without their involvement.

153.   Neuronetics promises that the physicians do not need to worry about the quality of documentation, communication with Government payors or private insurance, or billing because Neuronetics will control all of those processes to ensure that those using Neuronetics' equipment enjoy high profits.

154.   Neuronetics trains technicians not to document any contraindications like seizures or psychosis in the notes, especially in Medicare patients, in order to hide any factors that demonstrate ineligibility from patient charts.

155.   Neuronetics boasted that its Medicare reimbursement rates were 100% and that its franchise/doctors never got any adverse actions from Medicare due to the fabrications on patient charts.

### E.   Overview of Federally-Funded Healthcare Programs

#### 1.   Medicare

156.   In 1965, Congress enacted Title XVIII of the Social Security Act, which established the Medicare Program to provide health insurance for the elderly and disabled. Medicare is a health insurance program for: people age 65 or older; people under age 65 with certain disabilities; and people of all ages with end-stage renal

1   disease (permanent kidney failure requiring dialysis or a kidney transplant). Medicare

2   now has four parts: Part A; Part B, Part C (managed care plans), and the Part D

3   (prescription drug) Program.

4       157.   Medicare Part A (Hospital Insurance) helps cover inpatient care in

5   hospitals, including critical access hospitals, and skilled nursing facilities (not

6   custodial or long-term care). Medicare Part A also helps cover hospice care and some

7   home health care.

8       158.   Medicare Part B (Medical Insurance) helps cover doctors' services and

9   outpatient care, including outpatient diagnostic exams and scans. Part B also helps

10  pay for covered health services and supplies when they are medically necessary.

11      159.   For more than fifty years, the Medicare Program has enabled the elderly

12  and disabled to obtain necessary medical services from medical providers throughout

13  the United States.

14      160.   The Medicare Program is administered through the United States

15  Department of Health and Human Services ("HHS") and, specifically, the Centers

16  for Medicare and Medicaid Services ("CMS"), an agency of HHS. Much of the daily

17  administration and operation of the Medicare Program is managed through private

18  insurers under contract with the federal government (particularly CMS).

19      161.   To participate in Medicare, providers must assure that their services are

20  provided economically and only when, and to the extent they are, medically

21  necessary. Sections 1814(a)(2) and 1835(a)(2) of the Social Security Act establish

that, as a condition for Medicare payment, a physician must certify the necessity of the services and, in some instances, recertify the continued need for those services. 42 C.F.R. §424.10.

162.   Regardless of the rules governing the particular type of care, in order for the federal government to cover Medicare Part A, Medicare Part B, or a Medicare Part C plan to provide coverage, all care must be "medically necessary."

163.   Medical care is "medically necessary" when it is ordered or prescribed by a licensed physician or other authorized medical provider, and Medicare (or a Medicare Part C plan) agrees that the care is necessary and proper. Services or supplies that are needed for the diagnosis or treatment of a medical condition must meet the standards of good medical practice in the local area.

### 2.   Other Federally-Funded Healthcare Programs

164.   In addition to Medicare, the federal government reimburses health care costs under several other federal health care programs, including but not limited to CHAMPUS/TRICARE, CHAMPVA and the Federal Employees Health Benefit Program.

165.   CHAMPUS/TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces. CHAMPVA, administered by the United States Department of Veteran Affairs, is a health care program for the families of veterans with a 100 percent service-connected disability. The Federal Employee Health Benefit Program,

administered by the United States Office of Personnel Management, provides health insurance for hundreds of thousands of federal employees, retirees, and their survivors.

166.   TMS treatment is billed to these federal health care programs using the false billing schemes described herein.

### 3.   Fraud on Medicare Advantage Programs

167.   While Defendants submitted many of their false claims directly to Federal healthcare programs (such as Medicare, Medicaid, and TRICARE), Defendants also submitted false claims indirectly to Medicare via private Medicare Advantage Organization plans ("MAOs") and to Medicaid via private Medicaid managed care organizations ("MCOs").

168.   Under the managed care model, the government pays a private insurance company a per-patient per-month fee to provide health benefits to beneficiaries of government health insurance programs such as Medicare Advantage and Medicaid.

169.   In 2009, Congress amended the FCA to make clear that it applies to claims to entities such as MAOs and MCOs that are funded by the government. Specifically, the FCA now provides that:

> the term "claim"—
> (A) means any request or demand . . . that—
> (i)   is presented to an officer, employee, or agent of the United States; or
> (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States

Government—

(I) provides or has provided any portion of the money or property requested or demanded; or

(II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded. . . .

31 U.S.C. §3729(b)(2) (emphasis added).

170.   The Senate Report for the 2009 FCA amendments explained that this "section of the bill clarifies that liability under §3729(a) attaches whenever a person knowingly makes a false claim to obtain money or property, any part of which is provided by the Government without regard to whether the wrongdoer deals directly with the Federal Government; with an agent acting on the Government's behalf; or with a third party contractor, grantee, or other recipient of such money or property." S. Rep. 111-10, 11, 2009 U.S.C.C.A.N. 430, 438.

171.   Defendants' fraud on MAOs and MCOs constitutes fraud on the Government because it results in the Government increasing its payments to them.

172.   CMS reimburses MAOs with monthly capitated payments that are periodically adjusted upward or downward depending on the severity of healthcare issues that their members typically face, i.e., Risk Adjustment Factors ("RAFs"). The use of RAFs allows CMS to pay MAOs for the risk of the category of beneficiaries they enroll. By doing so, CMS should be able to make appropriate and accurate payments for enrollees with differences in expected healthcare costs. The use of RAFs also allows CMS to use standardized bids as base payments to Medicare Advantage plans.

173. MAOs regularly submit risk adjustment information and data concerning their members (such as age, gender, healthcare diagnoses and medical treatments) to CMS to affect the amount of the monthly capitated payments they receive. Such information is reported in the form of MA risk scores ("Risk Scores"). Generally, the less healthy an MAO's plan members are reported to be as a group, that is, the higher their composite MA Risk Scores, the more money the MAO receives from CMS. CMS calculates such risk-adjusted payments pursuant to certain actuarial principles underlying what is known as the Hierarchical Condition Category ("HCC") Model.

174. MAOs submit MA Risk Score data to CMS on a form known as a Risk Adjustment Payment System ("RAPS") report. The forms are typically submitted monthly.

175. The enabling laws governing CMS' administration of MA Program payments, including its risk scoring and adjustment methodology, are found in Section 1853 of the Social Security Act [42 U.S.C. §1395w-23].

176. The administrative agency rules for determining and adjusting MA payments from CMS are codified at 42 CFR Part 422, Subpart G, §§422.300 to 422.324.

177. The MA Program policies and practices that CMS conveys to all MAOs are set out principally in CMS' published Medicare Managed Care Manual. Chapter 7 of the manual instructs MAOs on how to properly implement CMS' HCC rate

1  adjustment methodology and Chapter 8 tells MAOs what steps need to be followed

2  in order to lawfully receive MA Program payments.

3      178.  In general, CMS' risk adjustment methodology relies heavily on

4  enrollee healthcare diagnoses, as specified by the International Classification of

5  Disease ("ICD Codes") guidelines, to prospectively adjust capitation payments for

6  specific members based on their health status.

7      179.  MAOs, are required to review their members' medical records and

8  submit their members' ICD Codes to CMS monthly to develop the HCC risk scores

9  that are used to adjust the monthly capitated reimbursements paid by CMS to that

10  MAO.

11      180.  CMS also uses RAPS data to reassess its risk assessment level and

12  capitation rates for each enrollee for the following Medicare Advantage Plan year.

13  RAPS submitted in one plan year will therefore affect the amount of capitated

14  payments for corresponding enrollees in subsequent plan years.

15      181.  Since CMS relies exclusively on the MAOs' reporting of their members'

16  ICD Codes in RAPS to determine MA Program reimbursement amounts, MAOs are

17  charged with ensuring the accuracy of such reports. CMS has repeatedly made MAOs

18  aware of this obligation in various public pronouncements, including CMS 2013

19  National Technical Assistance Risk Adjustment 101 Participant Guide at p.13.

20  ("Accurate risk-adjusted payments rely on the diagnosis coding derived from the

21  member's medical record.")

1    182.  Accordingly, when healthcare providers, like Defendants, falsely bill an

2    MAO, it results in increased RAPS scores, which indirectly results in the

3    Government paying more money to that MAO, because the MAO communicates to

4    CMS that its members are sicker and in need of more costly healthcare services than

5    is actually the case.

6    183.  Specifically with respect to this case, the Defendants falsely diagnosed

7    patients with severe depression in order to justify administering TMS treatments to

8    them. For those patients covered by MAOs or MCOs, this false reporting resulted in

9    increased payments from CMS to the MAOs or MCOs because the false diagnoses

10   caused upward adjustment of the MAOs' monthly capitated payments by falsely

11   portraying the misdiagnosed patients as having more severe healthcare issues than

12   they actually had.

13   184.  The false diagnoses of severe depression in numerous patients caused

14   an increase in MA Risk Scores by causing the MAO's plan members, as a group, to

15   appear less healthy than they really were, which increased the composite MA Risk

16   Scores, thus increasing the amount of money the MAOs received from CMS.

17   185.  In June 2022, the United States Department of Justice filed a Statement

18   of Interest (ECF No. 120) in *United States ex rel. Zafirov v. Florida Medical Assoc.,*

19   *Inc.*, No. 8:19-cv-1236, confirming that falsely diagnosing patients covered by

20   MAOs and MCO's constituted a violation of the FCA.

21   186.  The *Zafirov* Statement of Interest reasoned that that if a healthcare

39

1  provider,

2  submitted unsupported diagnosis codes in connection with the Medicare
   Advantage program, such unsupported diagnosis codes could be
3  material to the Government's decision to pay and could directly impact
   the amount of the payment received by a Medicare Advantage
4  Organization ("MAO") and that the MAO then pays to the Provider
   Defendants.

5

6  187.   The details of how the capitated payment is determined is discussed in

   various decisions including *U.S. ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d
7
   1010, 1020-1-21 (N.D. Cal. 2020); *U.S. v. United Healthcare Ins. Co.*, 848 F.3d
8
   1161, 1167-1170 (9th Cir. 2016) (*Swoben*); *U.S. ex rel. Silingo v. WellPoint, Inc.*,
9
   904 F.3d 667, 672-374 (9th Cir. 2018); and *UnitedHealthcare Ins. Co. v. Becerra*, 9
10
   F.4th 868, 874-877 (D.C. Cir. 2021).
11

12  188.   The purpose of the risk adjustment model is to estimate the costs of care

   for each beneficiary based on a variety of factors including certain demographic and
13
   health factors. The various factors are put into the model and the resulting output is
14
   a risk score that is used to calculate the capitated rate for the individual beneficiary
15
   that is ultimately paid to the MAO by Medicare. The higher the risk score, the higher
16
   the capitated payment for the beneficiary. This is referred to as "risk adjustment."
17

18  189.   The MAO then pays its providers from the money it receives from CMS.

   The diagnosis codes that medical providers submit are the only factors that CMS uses
19
   to determine a beneficiary's health status to calculate the beneficiary's risk score and
20
   thus to calculate how much CMS will pay for that beneficiary. *Ormsby*, 444 F. Supp.
21

1  3d 1010, 1020.

2  190.  The risk adjustment model groups these diagnosis codes into

3  Hierarchical Condition Categories ("HCCs"). The codes that represent chronic

4  conditions that persist year over year, have an impact on a beneficiary's risk score,

5  and are considered risk-adjusting diagnosis codes.

6  191.  Severe depression is one of those chronic conditions that impacts a

7  beneficiary's risk score, such that CMS will pay a higher capitated amount for a

8  beneficiary falsely designated as suffering from severe depression than it would pay

9  for that beneficiary had he not been falsely diagnosed as suffering from severe

10  depression.

11  192.  Given the critical role the diagnosis codes play in determining the

12  capitated payments, CMS has a vested interest in ensuring these diagnosis codes are

13  properly supported by beneficiaries' medical records, and CMS requires that MAOs

14  certify that the diagnosis codes they submit are accurate, complete and truthful. CMS

15  also requires MAOs to have compliance programs in place to ensure diagnosis codes

16  are accurate, complete and truthful. CMS does periodic audits of the diagnosis codes,

17  to identify any unsupported codes and problematic coding patterns.

18  193.  When providers like Defendants submit false risk adjusting diagnosis

19  codes (falsified in order to justify TMS treatment) that risk adjusting diagnosis code

20  increases the risk score for that beneficiary and results in an improperly inflated

21  payment.

194.   The intervening steps between the initial diagnosis code and the payment are akin to the claims payment process under traditional Medicare and do not break the causal link between a diagnosis code and the capitated payment.

F.   **Anti-Kickback Statute Violations**

195.   The Anti-Kickback Statute ("AKS") prohibits any person or entity from knowingly and willfully offering, paying, soliciting, or receiving any remuneration, directly or indirectly, to induce or reward a person for, inter alia, purchasing, ordering, arranging for, or recommending the purchase or ordering of any goods or services for which payment may be made, in whole or in part, under a federal health program, including Medicare. 42 U.S.C. §1320a-7b(b)(l),(2).

196.   The AKS is intended to prevent arrangements that can lead to unfair competition, the distortion of medical decision-making, overutilization of services and supplies, and increased costs to Federal health care programs. See 65 Fed. Reg. 59,434, 59,440 (Oct. 5, 2000).

197.   To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a per se prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback gave rise to overutilization or poor quality of care. The statute was first enacted in 1972, and was strengthened in 1977 and 1987, to ensure that kickbacks masquerading as legitimate transactions did not evade its reach. *See* Social Security Amendments of 1972, Pub. L. No. 92-603, §§242(b) and (c); 42 U.S.C. §1320a-7b, Medicare-Medicaid

1   Antifraud and Abuse Amendments, Pub. L. No. 95-142; Medicare and Medicaid

2   Patient and Program Protection Act of 1987, Pub. L. No. 100-93.

3      198.   For the purposes of the AKS, "remuneration" includes the transfer of

4   anything of value, "directly or indirectly, overtly or covertly, in cash or in kind." 42

5   U.S.C. §1320a-7b(b)(l).

6      199.   The AKS's legislative history confirms Congress's intent to interpret

7   the term "remuneration" broadly. See 123 Cong. Rec. 30,280 (1977) (Statement of

8   Rep. Rostenkowski), cited at 56 Fed. Reg. 35,952, 35,958 (July 29, 1991) (Final Rule

9   regarding AKS Safe Harbors).

10     200.   The knowing and willful payment of remuneration to a physician – or

11  the knowing and willful receipt of remuneration by a physician - violates the AKS

12  when even one purpose of the transaction is to induce the referral - or generation - of

13  federal health program-related business. The term "referral" is used herein to stand

14  in for the language in the AKS, including arranging for or recommending the ordering

15  of goods for which Medicare pays.

16     201.   An individual who violates the AKS is also subject to exclusion from

17  participation in federal health care programs and, as of August 6, 1997, civil

18  monetary penalties of $50,000 per violation and three times the amount of

19  remuneration paid. 42 U.S.C. §1320a-7(b)(7); 42 U.S.C. §1320a-7a(a)(7).

20     202.   The United States Department of Health and Human Services Office of

21  Inspector General (HHS-OIG) has promulgated "safe harbor" regulations that

43

1  identify six payment practices that are not subject to the AKS because such practices

2  are unlikely to result in fraud or abuse. See 42 C.F.R. §1001.952. Safe harbor

3  protection is afforded only to those arrangements that meet all of the specific

4  conditions set forth in the safe harbor.

5      203.   Defendants' conduct in this matter did not comply with any safe harbors.

6      204.   In 2010, Congress amended the AKS to clarify that "a claim that

7  includes items or services resulting from a violation of this section constitutes a false

8  or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable

9  Care Act of 2010 ("PPACA"), Pub. L. No. 111–148 §6402(f), 124 Stat. 119, 759

10 (codified at 42 U.S.C.§1320a–7b(g)).

11     205.   According to PPACA's legislative history, this amendment to the AKS

12 was intended to clarify "that all claims resulting from illegal kickbacks are considered

13 false claims for the purpose of civil actions under the False Claims Act, even when

14 the claims are not submitted directly by the wrongdoers themselves." 155 Cong. Rec.

15 S10854.

16     206.   Compliance with the AKS is a condition of payment under federal

17 health care programs, and providers participating in the Medicare and Medicaid

18 programs must agree to comply with the AKS and certify such compliance.

19     207.   As a condition of payment, Medicare providers such as physicians and

20 surgical facilities must certify compliance with the AKS. The United States relied

21 upon these health care providers' compliance with federal health care laws, including

1    the certifications of compliance submitted or caused to be submitted.

2       208.   These false certifications are material. For decades, compliance with the

3    AKS has been material to the United States' decision to pay Medicare claims. The

4    United States has continuously brought suit and pronounced publicly that it will not

5    use taxpayer money to reimburse services arranged for through the use of unlawful

6    inducements.

7       209.   Compliance with the AKS was a condition of payment and a material

8    requirement for receiving Medicare reimbursement.

9       210.   It is CMS's policy not to pay claims that are tainted by kickbacks.

10   **G.    Stark Law Violations**

11      211.   Defendants routinely violated the Stark Law by engaging in improper

12   referrals, including psychiatrists referring patients to TMS centers in which they

13   served as sham Medical Directors.

14      212.   These referrals do not fall within the "in-office ancillary services"

15   exception, or any other exception to the Stark Rule.

16      213.   The "in-office ancillary services" exception to the Stark Rule provides

17   that the referral restriction does not apply to ancillary services (1) furnished by an

18   individual supervised by a physician in the group practice (2) in a building used by

19   the group and (3) billed under the group's Medicare provider number. 42 U.S.C.

20   §1395nn(b)(2), 42 C.F.R. §411.355(b).

21      214.   To satisfy the supervision requirement, ancillary services must be

furnished by: (a) the referring physician, (b) a physician who is a member of the same group practice as the referring physician, or (c) an individual who is supervised by the referring physician or by another physician in the group practice. 42 C.F.R. §411.355(b)(1). "Direct supervision" requires the physician to be present in the office suite and immediately available to provide assistance and direction throughout the procedure. 42 C.F.R. §410.26, 410.32(b)(3)(ii); Medicare Benefits Policy Manual (MBPM) Ch. 15 §230.5. If a solo practitioner or group practice uses the "same building" option, the ancillary services must be provided at the same street address as an office of the solo practitioner or group. 42 C.F.R. §411.351.

215.    Defendants' scheme did not meet this exception because the psychiatrists who referred patients were not involved in supervising the TMS sessions.

## V.    FRAUD ON PRIVATE INSURANCE COMPANIES IN VIOLATION OF THE CALIFORNIA INSURANCE FRAUDS PREVENTION ACT

216.    In addition to defrauding Medicare, TRICARE, and other Government payors, Defendants also falsely billed private insurance companies, including insurance companies in California in violation of the California Insurance Frauds Prevention Act, Cal. Ins. Code §1871.7.

217.    None of the allegations set forth in this Complaint are based upon a public disclosure of allegations or transactions in: (a) a California criminal, civil, or administrative hearing; (b) a report, hearing, audit, or investigation of the California

1   Legislature, California, or a governing body of a political subdivision; and (c) the

2   news media, as those terms are used in California Insurance Code §1871.7(h)(2).

3       218.   Relator has made all pre-filing disclosures required by California

4   Insurance Code §1871.7(h)(2)(B) by service on the Alameda County District

5   Attorney and the California Insurance Commissioner.

6       219.   The legislative findings and declarations associated with California

7   Insurance Code §1871.7 make clear that California lawmakers were concerned with

8   health care fraud: "Health insurance fraud is a particular problem for health insurance

9   policyholders. Although there are no precise figures, it is believed that fraudulent

10  activities account for billions of dollars annually in added health care costs nationally.

11  Health care fraud causes losses in premium dollars and increases health care costs

12  unnecessarily." *See* Cal. Ins. Code §1871(h). This provision is referred to as the

13  California Insurance Frauds Prevention Act ("CIFPA").

14      220.   California law expressly prohibits the solicitation, acceptance, or

15  referral of any business to or from any entity "with the knowledge that, or reckless

16  disregard for whether" the individual or entity will present or cause to be present a

17  false or fraudulent claim for payment of a health care benefit. *See* Cal. Pen. Code

18  §549. It is likewise illegal for any entity to "knowingly make or cause to be made

19  any false or fraudulent claim for payment of a health care benefit." *See* Cal. Pen.

20  Code §550.

21      221.   The CIFPA provides that any entity violating, *inter alia*, the provisions

47

1    of section 1871.7 or Penal Code sections 549 or 550, is subject "to a civil penalty of

2    not less than five thousand dollars ($5,000) nor more than ten thousand dollars

3    ($10,000), plus an assessment of not more than three times the amount of each claim

4    for compensation." Cal. Ins. Code §1871.7(b).

5        222.  As explained below, Defendants' conduct violated the California

6    Insurance Code and/or the California Penal Code, thereby giving rise to this action.

7    **VI.   HARM TO PATIENTS**

8        223.  The false billing schemes employed by Defendants described herein did

9    not just cheat the Government; they resulted in patient harm.

10       224.  Some types of patient harm were discussed in the Clinical TMS Society

11    Clinical Standards Committee meeting on May 12, 2018, as reflected in the minutes

12    from that meeting.

13       225.  For a patient to be eligible for TMS treatment, the patient must meet the

14    criteria including failed trials of different classes of antidepressants and failed

15    cognitive behavior therapy or other therapies for an extended time.

16       226.  These failed trials need to be well documented, and Defendants engage

17    in false documentation of patient charts in order to make them appear eligible.

18       227.  Defendants also falsely document patient charts by omitting facts (such

19    as the patient being in a psychiatric hospital) that would exclude the patient from

20    eligibility for TMS treatment.

21       228.  If patient is suicidal, and a TMS technician falsely states that the patient

1  is not suicidal on order to justify TMS treatment, that patient may not get proper

2  psychiatric treatment for the patient's suicidal ideation.

3       229.   Fabricating information in a patient's chart in order to make the patient

4  appear eligible for TMS treatment results in improper treatment of patients.

5       230.   Patients need to be monitored by a licensed psychiatrist as their

6  treatment progresses so that adjustments to treatment protocols can be made as

7  necessary.

8       231.   Defendants' practice of limiting a psychiatrist's involvement to a

9  patient's initial session, then leaving the patient to deal only with the technician

10  administering the TMS treatment creates a safety risk to the patient.

11       232.   If the patient's depression worsens or is not helped by the TMS

12  treatment, there is no psychiatrist involvement to intervene and help the patient.

13  Applicable rules and regulations require that a psychiatrist monitor and document

14  weekly clinical status by visiting the patient, which never happens in Defendants'

15  scheme. Defendants' scheme mandates that a psychiatrist not be involved in

16  monitoring the patients' TMS treatments. This puts patients at risk because there is

17  no psychiatrist monitoring their condition and making informed decisions about

18  whether to stop the TMS treatment and potentially try other types of treatment.

19       233.   Instead, Defendants know that they can bill substantial amounts for

20  daily TMS treatment of patients, with minimal expense and no physician

21  involvement, turning every TMS center into a major profit center. Defendants (driven

1  by the private equity companies and large corporations that control them) put their

2  interest in profits over the welfare of their patients.

3  ## VII.  LEGAL FRAMEWORK

4  234.  The False Claims Act ("FCA") provides, in part, that any person who:

5  > (a)(1)(A) knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval;

6

7  > (a)(1)(B) knowingly makes, uses, or causes to be made or used, a
> false record or statement material to a false or fraudulent claim; [or]

8  > (a)(1)(G) knowingly makes, uses, or causes to be made or used, a false
> record or statement material to an obligation to pay or transmit money or
9  > property to the Government, or knowingly conceals or knowingly and
> improperly avoids or decreases an obligation to pay or transmit money or
10  > property to the Government.

11  > Is liable to the United States Government for a civil penalty of not less
> than $5,000 and not more than $10,000, as adjusted by the Federal Civil
12  > Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of
> damages which the Government sustains because of the act of that person.

13  31 U.S.C. §3729.

14  235.  For purposes of the FCA,

15
16  > [T]he terms "knowing" and "knowingly"—(A) mean that a person, with
> respect to information—(i) has actual knowledge of the information; (ii)
> acts in deliberate ignorance of the truth or falsity of the information; or
17  > (iii) acts in reckless disregard of the truth or falsity of the information;
> and (B) require no proof of specific intent to defraud.

18  ## VIII.  MEDICARE AND MEDICAID REIMBURSEMENT
19  PROTOCOL

20  236.  When hospitals and physicians render services and supplies to Medicare

21  or Medicaid beneficiaries, Medicare or Medicaid, respectively, will reimburse the

1   healthcare provider for those services and supplies, based on set rates.

2       237.   Participating healthcare providers file claims for services or supplies

3   rendered under the Medicare or Medicaid programs. Medicare Part B and Medicaid

4   are medical insurance plans, and Medicare Part D is a prescription drug coverage

5   plan.

6       238.   When a healthcare provider files a reimbursement claim for services

7   rendered, he or she fills out the 837P standard format electronic billing form or Form

8   CMS-1500. The accuracy of coding is key to submitting valid claims.

9       239.   The proper procedures for coding are listed in Chapter 23 of the

10  Medicare Claims Processing Manual, entitled Fee Schedule Administration and

11  Coding Requirements.

12      240.   By submitting a 837P standard format electronic billing form or Form

13  CMS-1500, the provider expressly certifies that the information contained in the form

14  is true, accurate, and complete and that the treatment and billing comply with the

15  Medicare Claims Processing Manual.

16      241.   Among the certifications that are made upon signing the CMS- 1500 or

17  837P is:

18          In submitting this claim for payment from federal funds, I certify that:
            1) the information on this form is true, accurate and complete; 2) I have
19          familiarized myself with all applicable laws, regulations, and program
            instructions, which are available from the Medicare contractor; 3) I have
20          provided or will provide sufficient information required to allow the
            government to make an informed eligibility and payment decision; 4)
21          this claim, whether submitted by me or on my behalf by my designated

51

billing company, complies with all applicable Medicare and/or Medicaid laws, regulations, and program instructions for payment including but not limited to the Federal anti-kickback statute and Physician Self-Referral law (commonly known as Stark law); 5) the services on this form were medically necessary and personally furnished by me or were furnished incident to my professional service by my employee under my direct supervision, except as otherwise expressly permitted by Medicare or TRICARE; 6) for each service rendered incident to my professional service, the identity (legal name and NPI, license #, or SSN) of the primary individual rendering each service is reporting in the designated section.

242. For services to be considered "incident to" a physician's professional services, 1) they must be rendered under the physician's direct supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of non-physicians must be included on the physician's bills.

243. CMS maintains the Healthcare Common Procedure Coding System (HCPCS) and publishes coding tables quarterly, listing the codes used by health care providers to be reimbursed for services covered by Medicare and Medicaid. The Current Procedural Terminology ("CPT") code set is published by the AMA and included in the CMS tables. The CPT code books include guidance and instructions on which codes to use and when.

244. The Medicaid Program is a joint state-federal program that provides health benefits for particular groups, such as indigent and disabled individuals.

245. The federal portion of each state's Medicaid payments is based on a state's per capita income.

1

## IX.   CAUSES OF ACTION

2

### A.   COUNT ONE - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(A)

3

246.   Relator restates and realleges all allegations in this Complaint within

4

this Court as if each were stated herein in their entirety and those allegations are

5

incorporated herein by reference.

6

247.   This is a claim for treble damages and penalties under the Federal False

7

Claims Act, 31 U.S.C. §3729, *et seq.*

8

248.   As alleged herein, Billing Defendants knowingly presented and/or

9

caused to be presented to federally-funded healthcare programs, including Medicare,

10

false or fraudulent claims for payment or approval, in violation of 31 U.S.C.

11

§3729(a)(1)(A).

12

249.   As alleged above, Billing Defendants billed for TMS procedures that

13

were not supervised by a physician and that were performed on patients that did not

14

meet the applicable criteria.

15

250.   As alleged herein, Neuronetics caused the presentation of false or

16

fraudulent claims, even though it may not have billed directly for providing

17

treatments.

18

251.   Additionally, Billing Defendants billed for services that were tainted by

19

violations of the Stark Law and Anti Kickback statutes, which makes these billings

20

violations of the False Claims Act.

21

**B.    COUNT TWO - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(B)**

252.    Relator restates and realleges all allegations in this Complaint within this Court as if each were stated herein in their entirety and those allegations are incorporated herein by reference.

253.    As alleged herein, Billing Defendants knowingly made and/or caused to be made false records or statements material to false or fraudulent claims for payment or approval presented to federally-funded healthcare programs, including Medicare, in violation of 31 U.S.C. §3729(a)(1)(B).

254.    As alleged herein, Neuronetics caused the presentation of false records or statements, even though it may not have billed directly for providing treatments.

255.    As alleged herein, Billing Defendants submitted false statements to Medicare and other Government healthcare programs with false information regarding TMS treatment.

**C.    COUNT THREE - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(G)**

256.    Relator restates and realleges all allegations in this Complaint within this Court as if each were stated herein in their entirety and those allegations are incorporated herein by reference.

257.    As alleged herein, Billing Defendants, directly or through their employees, contractors, or agents, knowingly made, used, or caused to be made or used, false records or false statements to conceal, avoid, or decrease an obligation by

1   Defendants to pay or transmit money or property to the United States, in violation of

2   31 U.S.C. §3729(a)(1)(G).

3       258.   Billing Defendants violated PPACA, which required them to self-report

4   and return Medicare overpayments within 60 days of identification. 42 U.S.C.

5   §1128J(d).

6       259.   As a result of Billing Defendants' fraudulent actions as alleged herein,

7   federally-funded health care program officials, their contractors, carriers,

8   intermediaries and agents, paid and approved claims for payment that should not have

9   been paid or approved, and which would not have been paid or approved had the

10   United States government known the facts underlying the submission of those claims.

11       260.   Billing Defendants misrepresented material conditions for payment

12   (including that patients met the criteria to receive TMS treatment and that treatments

13   were supervised by physicians.)

14       261.   The claims that Defendants submitted and/or caused to be submitted

15   were "false" and/or "fraudulent" within the meaning of the FCA because they did not

16   comply with material conditions of payment established by the United States

17   government.

18       262.   Defendants' conduct was "knowing" as that term is used in the FCA.

19       263.   "Because of" Defendants' conduct, the United States has suffered

20   significant losses in an amount to be further determined.

21

**D.     COUNT FOUR - VIOLATION OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §3729(a)(1)(C)**

264.   Relator restates and realleges all allegations in this Complaint within this Court as if each were stated herein in their entirety and those allegations are incorporated herein by reference.

265.   As alleged herein, Neuronetics violated 31 U.S.C. §3729(a)(1)(C) by conspiring with the Billing Defendants to commit violations of 31 U.S.C. §3729(a)(1)(A), (B) and (G).

266.   As alleged herein, Neuronetics caused the presentation of false records or statements, even though it may not have billed directly for providing treatments.

267.   As alleged herein, Billing Defendants submitted false statements to Medicare and other Government healthcare programs with false information regarding TMS treatment.

**E.     COUNT FIVE - CALIFORNIA INSURANCE FRAUDS PREVENTION ACT, Cal. Ins. Code §1871.7**

268.   Relator restates and realleges all allegations in this Complaint as if each were stated herein in their entirety and said allegations are incorporated herein by reference.

269.   This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act ("CIFPA").

270.   By virtue of the acts described above, Defendants knowingly presented, or caused to be presented, false or fraudulent claims to private health insurance

56

1    companies operating in the state of California for payment or approval in violation

2    of each patient's private health insurance contract.

3        271.  By virtue of the acts described above, Defendants knowingly made,

4    used, or caused to be made or used false records and statements and omitted material

5    facts to induce the private health insurance companies in California, or for patients

6    in California covered by those insurers, to approve or pay such false and fraudulent

7    claims. This conduct violated, *inter alia*, California Penal Code §§549 and 550.

8        272.  Private insurance companies in California, or those insurers that covered

9    patients in California, unaware of the falsity of the records, statements, and claims

10   made, used, presented, or caused to be presented by Defendants, paid and continue

11   to pay the claims that would not be paid but for Defendants' illegal conduct.

12       273.  Defendants knowingly submitted and/or caused to be made or used false

13   records or false statements in order to avoid or decrease their respective obligations

14   to return overpayments to these private health insurance companies.

15       274.  By reason of the Defendants' acts, these private health insurance

16   companies have been damaged, and continue to be damaged, in a substantial amount

17   to be determined at trial.

18       275.  By reason of the Defendants' acts, the State of California has also been

19   damaged, and continues to be damaged, in a substantial amount to be determined at

20   trial.

21       276.  The State of California is entitled to a civil penalty for each and every

1   false or fraudulent claim, record, or statement made, used, presented, or caused to be

2   made, used, or presented by Defendants.

3   **X.     PRAYER FOR RELIEF**

4   **WHEREFORE,** for the reasons set forth above, Relator, for and on behalf of

5   the United States and the State of California, respectfully requests that the Court enter

6   an Order against Defendants as follows:

7   a.      An Order requiring Defendants to cease its violations of the FCA and

8   CIFPA;

9   b.      An Order entering judgment in favor of the United States and Relator
    and against Defendants in an amount equal to three times the damages the United

10  States has sustained because of Defendants' actions, as well as the maximum civil
    penalty allowed by law for each violation of the FCA;

11  c.      An Order awarding to Relator the maximum amount allowed as a

12  "Relator's Share" pursuant to the FCA (31 U.S.C. §3730(d)) and CIFPA (Cal. Ins.

13  Code §1871.7(g));

14  d.      An Order entering judgment in favor of the State of California and
    Relator and against Defendants in an amount equal to three times the damages that

15  private insurance companies have sustained because of Defendants' actions;

16  e.      An Order awarding to Relator and from Defendants all reasonable
    expenses that were necessarily incurred, plus reasonable attorneys' fees and costs;

17  f.      An Order awarding to the United States, the State of California, and

18  Relator prejudgment interest;

19  g.      An Order awarding to the United States, the State of California, and
    Relator post-judgment interest; and

20  h.      An Order awarding to the United States, the State of California, and
    Relator any other and further relief as the Court may deem just and proper.

21

1

## JURY TRIAL DEMANDED

2

Relator, on behalf of the United States, respectfully requests a jury trial on all issues.

3

Dated: December 13, 2022

4

5

Respectfully submitted,

6

By:  /s/ Cory S. Fein
     Cory S. Fein (State Bar No. 250758)

7

     cory@coryfeinlaw.com
     Cory Fein Law Firm
     712 Main St., Suite 800

8

     Houston TX 77002
     Telephone: (281) 254-7717

9

     Facsimile: (530) 748-0601

10

     Attorneys for Relator

11

12

13

14

15

16

17

18

19

20

21